# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * * * * * *
A.W., a minor, by and through her parent    *
and natural guardian, VANESSA WOOD,         *        No. 15-1568V
                                            *        Special Master Christian J. Moran
                 Petitioner,                *
                                            *        Filed: February 1, 2018
v.                                          *
                                            *        entitlement, bench ruling,
SECRETARY OF HEALTH                         *        DTaP, food allergies, eczema,
AND HUMAN SERVICES,                         *        Dr. Vera Byers
                                            *
                 Respondent.                *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for petitioner;
Camille M. Collett, United States Dep't of Justice, Washington, DC, for respondent.

### PUBLISHED DECISION DENYING COMPENSATION[1]

Ms. Wood is the mother of A.W., a girl who is allergic to some foods and who suffers from atopic dermatitis, which is frequently called eczema. Ms. Wood claims that a diphtheria-tetanus-acellular pertussis (DTaP) vaccination caused A.W.'s food allergies and skin disease. After Ms. Wood filed A.W.'s medical records, the parties filed a series of reports from Dr. Vera Byers (petitioner's expert) and Dr. Andrew MacGinnitie (respondent's expert).

A hearing was held on January 24-25, 2018. After the parties submitted all their evidence, the undersigned issued a bench decision, finding that Ms. Wood had failed to establish that she was entitled to compensation. See Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 704 n. 18 (2008) (noting "[e]ven a special master's ruling on entitlement may be delivered from the bench, with no written opinion").

The undersigned is issuing this document for two reasons. First, this document will become available to the public pursuant to 42 U.S.C. § 300aa—12(d)(4).

Second, this document provides an abbreviated recitation for the basis of decision. See Hebern v. United States, 54 Fed. Cl. 548 (2002) (example of a judge from the United States

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

Court of Federal Claims formalizing a bench ruling denying a motion for review).  As explained in the bench ruling, the undersigned considered all the evidence, including the medical records, expert reports, medical articles, and oral testimony.  The undersigned's consideration of this evidence began when the evidence was received, as outlined in the recitation of the case's procedural history.  See Vaccine Rule 5 (providing for a framework in which special masters evaluate the evidence, and even make tentative findings and conclusions, prior to issuing a decision).

## Facts

Because the parties agreed that medical records created contemporaneously with the events described in the records accurately set forth events in A.W.'s life and because the parties' briefs are generally in agreement, only a succinct recitation of facts is presented here.  A.W. was born in October 2012.  When she was two months old, she had difficulty breathing and was diagnosed at a hospital as infected with the respiratory syncytial virus (RSV).  A.W. recovered and, approximately one week later, she received a set of vaccines, including her first dose of DTaP.

Ms. Wood brought A.W. to her pediatrician's office 19 days after vaccination.  A.W. had a dry rash on her face, neck, shoulders, trunk, and knees.  The pediatrician did not record the duration of the dry rash.  But, Ms. Wood testified that the rash started approximately one week after the vaccination.  The pediatrician recommended lotions.  Nine days later, the rash was worse and the pediatrician recommended an allergist.

The first of many visits with the allergist, Francisco Peralta, took place on February 15, 2013.  Dr. Peralta observed that A.W. had eczema on many parts of her body and recorded a history in which Ms. Wood associated worsening symptoms when she (Ms. Wood) consumed milk, eggs, or nuts.  A member of Dr. Peralta's office administered a skin (or prick) test to A.W.  Dr. Peralta's dictated office note indicated that A.W. was allergic to cow's milk and eggs.  Exhibit 3 at 2.  The record of the allergy testing also indicated that A.W. was not allergic to several substances, including beef.  Exhibit 3 at 48.

On March 4, 2013, A.W. had her four-month well-baby checkup.  Although Ms. Wood reported that A.W. had improved after she (Ms. Wood) changed her diet, A.W. still had some eczema.  She was diagnosed as having "dermatitis due to consumed food; adverse food reaction (not anaphylactic)."  Exhibit 2 at 23.  A.W. also received another set of vaccines, including an additional dose of DTaP.

When A.W. returned to Dr. Peralta, the allergist, 11 days later, she still had a rash on her face.  The medical record does not suggest any particular worsening in the intervening 11 days.  Exhibit 3 at 4.  However, Ms. Wood testified that within 24 hours of the second set of vaccinations, A.W.'s eczema got much worse.

On March 21, 2013, A.W. had her first appointment at a dermatologist's office.  A.W. was again noted to have eczema and was prescribed oral antibiotics.

Thereafter, A.W. frequently visited her pediatrician, allergist, and dermatologist.  Their records show that A.W.'s eczema waxed and waned in a way that Dr. MacGinnitie described as

fairly typical for eczema.  Dr. Peralta's records also show that A.W. became allergic to more foods as she matured.

Ms. Wood movingly testified about how A.W.'s food allergies affect A.W.'s life and the lives of other family members.  Ms. Wood effectively conveyed how she is required to monitor A.W.'s diet carefully and she is frustrated that she cannot help her daughter more.  She was quite sympathetic.

## Analysis

Ms. Wood bore the burden to establish her case on a more-likely-than-not basis.  42 U.S.C. § 300aa-13(a); Bunting v. Sec'y of Health & Human Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).  The elements are set out in Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

As explained in more detail in the bench ruling, Ms. Wood failed to meet her burden of proof.  Her case faltered as a result of resting her claim of causation on an expert who was relatively unqualified compared to the respondent's expert.  As a result, petitioner's case fell far short of satisfying the three Althen prongs.

### Expert Qualifications

Special masters may consider the relative expertise of testifying experts when weighing the value of their opinion.  See Depena v. Sec'y of Health & Human Servs., No. 13-675V, 2017 WL 1075101 (Fed. Cl. Spec. Mstr. Feb. 22, 2017), mot. for rev. denied, 133 Fed. Cl. 535, 547-48 (2017), appeal docketed No. 2017-2527 (Fed. Cir. Sep. 8, 2017); Copenhaver v. Sec'y of Health & Human Servs., No. 13-1002V, 2016 WL 3456436 (Fed. Cl. Spec. Mstr. May 31, 2016), mot. for rev. denied, 129 Fed. Cl. 176 (2016).  Ms. Wood relied upon an expert, Dr. Byers, who possesses far less expertise than the Secretary's expert, Dr. MacGinnitie, in the relevant field.

Dr. MacGinnitie's superior qualifications to discuss the cause of food allergies and eczema can be illustrated in various ways.  To start, Dr. MacGinnitie is board-certified in immunology and allergy and Dr. Byers is not.  Dr. MacGinnitie currently practices medicine by treating patients and many of Dr. MacGinnitie's patients suffer from food allergies and/or eczema.  By contrast, Dr. Byers stopped her regular practice of medicine in approximately 2002 and now sees patients only in the context of legal cases.  Dr. MacGinnitie also is an associate professor of pediatrics at Harvard Medical School.  At Harvard and at other institutions where Dr. MacGinnitie is affiliated, he has taught about food allergies.  Dr. Byers currently holds no academic position and appears never to have taught about food allergies.  The contrast in qualifications carried over to their respective presentations.  Dr. Byers did not answer questions clearly.  Dr. MacGinnitie was very understandable.

### Althen Prong One

Ms. Wood failed to meet her burden regarding Althen prong one, which requires the petitioner to present a theory explaining how the relevant vaccine can cause the relevant illness. As presented at trial—though not how Dr. Byers set forth her opinion in her reports—Dr. Byers maintained that (a) the DTaP vaccine contains beef residue due to its manufacturing process, (b)

A.W.'s exposure to beef through her mother's breast milk combined with A.W.'s exposure to beef residue in the DTaP vaccine in the context of a cytokine-enhanced reaction led to A.W.'s development of sensitization to beef and then an allergy to beef,[2] and (c) the food allergy led to eczema.  This theory was not persuasive.

One critical flaw of Dr. Byers's opinion concerned her unsupported claim that the trace amounts of beef residue in the DTaP vaccine could induce an immunological response.  The parties agreed that, based upon information the Centers for Disease Control (CDC) present to the public, the bacteria that are cultured to develop the components of the DTaP vaccine are grown in a medium containing products derived from beef.  They also agreed that the manufacturing process involves several steps designed to eliminate these products from the actual vaccine given to people.  Nonetheless, the CDC report that there remain "trace quantities" of beef in the DTaP vaccine.  Exhibit 19 at B7.  Dr. Byers presented no persuasive evidence indicating that this trace amount could induce an immunological response.

Dr. Byers's proposition that the trace amounts of food protein in the DTaP vaccine induced A.W.'s food allergy was further undermined when Dr. Byers acknowledged, on the stand, that the trace amounts of beef protein were substantially less than the amount of beef protein to which A.W. was exposed through her mother's breast milk before, during, and after the period when she was vaccinated.  When asked to explain this dilemma, she claimed that the cytokine response to the vaccination, in conjunction with the trace beef proteins, was sufficient to induce sensitization or allergy.  This cytokine theory, which was presented without any support, did not appear in any of her three expert reports.  See exhibits 7, 8, and 11.  Dr. Byers's inability to distinguish non-vaccine sources of the alleged inciting antigen makes her opinion comparable to the opinion she expressed in the Omnibus Autism Proceeding.  For an example of a special master's rejection of Dr. Byers's testimony in this context, see Snyder v. Sec'y of Health & Human Servs., No. 01-162V, 2009 WL 332044, at *65, *72-76 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), mot. for rev. denied, 88 Fed. Cl. 706 (2009).

In addition to this significant gap in Dr. Byers's opinion, the Secretary introduced, through Dr. MacGinnitie, at least four epidemiologic studies that explored the connection between vaccines and either eczema or food allergies.  If the trace amounts of food protein in the vaccines were sufficient to sensitize children to a food allergy, one would expect increased prevalence of food allergy due to vaccinations.  These epidemiologic studies did not find any increased incidence of allergy resulting from the vaccines, further undermining Dr. Byers's opinion that trace amounts of protein could induce an immunological response.  See Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144 (Fed. Cir. 1992) (endorsing consideration of epidemiologic evidence); Caves v. Sec'y of Health & Human Servs., 100 Fed. Cl. 119, 135 (2011) (recognizing that special masters may consider epidemiologic evidence), aff'd, 463 Fed. App'x 932 (Fed. Cir. 2012).  When asked to address how these epidemiological studies affected her medical theory, Dr. Byers had, literally, no comment.

_____

[2] Dr. Byers appeared to fluctuate as to whether (1) A.W. was sensitized to beef through breast milk and then developed an allergy due to the vaccine, or (2) A.W. was sensitized to beef through the vaccine and then developed an allergy due to breast milk.

<u>Althen Prong Two</u>

Dr. Byers's attempt to present a logical sequence of cause and effect causally connecting the DTaP vaccine with A.W.'s food allergies and eczema was significantly flawed.

First, a basic predicate for Dr. Byers's theory is that A.W. was allergic to beef as a result of the vaccination.  Dr. Byers relied upon testing that Dr. Peralta's office performed in September 2014.  Exhibit 3 at 15, 40.  From this result, Dr. Byers apparently inferred that the DTaP vaccine from January 2013 contributed to a beef allergy that was manifesting as eczema.  However, when Dr. Peralta tested A.W. for beef in February 2013, the test was negative.  Exhibit 3 at 48.  This inconsistency, alone, justifies finding Ms. Wood is not entitled to compensation.[3]

Second, in considering whether petitioners have met their burden on prong two, the Federal Circuit directed special masters to consider the views of treating doctors.  <u>Capizzano v. Sec'y of Health & Human Servs.</u>, 440 F.3d 1317, 1326 (Fed. Cir. 2006).  Here, both Ms. Wood and Dr. Byers recognized that none of A.W.'s treating doctors linked her vaccines to her subsequent health problems.  Moreover, in the course of this litigation, when Dr. Peralta was asked if A.W.'s food allergies were attributable to her vaccinations, he stated that "[v]accines have not been shown to cause food allergies."  Exhibit 9.  This is another strong reason for not crediting Dr. Byers's opinion.

Third, the Federal Circuit has also instructed special masters to consider whether a vaccinee's course demonstrates challenge-rechallenge.  <u>Capizzano</u>, 440 F.3d at 1325-26.  Here, Ms. Wood testified that A.W.'s eczema worsened within 24 hours after the four-month vaccinations and within approximately one week after other vaccinations.  Three issues undermine this point:  (1) the medical records created shortly after the various vaccinations do not reflect any dramatic worsening, (2) a worsening approximately seven days after exposure to the antigen is not consistent with the view Dr. Byers and Dr. MacGinnitie shared that a child with eczema who also has food allergies will show a worsening of eczema within 24 hours of reencountering the allergen, and (3) Dr. Byers did not persuasively account for the waxing and waning in the normal course of eczema.

---

[3] During her testimony, Dr. Byers revealed that she first saw Dr. Peralta's skin testing results only when preparing for her testimony.  She maintained that her copy of exhibit 3 did not contain this result.  If Dr. Byers were correct, then it would seem that Ms. Wood's attorney failed to deliver a complete copy of exhibit 3 to Dr. Byers.  Nonetheless, at the beginning of her testimony, Dr. Byers maintained that the skin testing results did not affect her opinion since she believed they indicated that A.W. was *not* tested for a beef allergy.  Operating under this presumption, she continued to present her theory of the case, which rested on the conclusion that A.W. developed a beef allergy following vaccination.  When Dr. Byers was directed to assume that A.W. tested negative for a beef allergy in February 2013 and then asked whether this fact would affect her opinion, Dr. Byers stated that she did not know and would need to think about it.  Dr. MacGinnitie used Dr. Peralta's medical records to demonstrate convincingly that A.W. was almost certainly tested for a beef allergy in February 2013, and that she did not have an allergy to beef at that time.

Althen Prong Three

The last element of a petitioner's case concerns timing.  Preliminarily, Dr. Byers and Dr. MacGinnitie agreed that allergies are developed in two steps.  The initial exposure to an antigen, such as bee venom, sensitizes an individual.  This sensitization stage, according to Dr. Byers and Dr. MacGinnitie, takes at least two, and maybe three weeks.  After an individual becomes sensitized to the antigen, another exposure to the antigen (bee venom) can cause an allergic reaction, for example swelling, within 24 hours.

Here, Dr. Byers assumed that A.W. started to manifest eczema two weeks after the January 2, 2013 DTaP vaccination.  The basis for Dr. Byers's assumption is not readily apparent since the pediatrician's January 21, 2013 record does not provide any information about the duration of the rash.  During the hearing, Ms. Wood attempted to fill in this gap by testifying that A.W. started to have a rash about one week after vaccination.  If Ms. Wood's testimony were credited, then the rash started sooner than Dr. Byers's sensitization-allergy theory would predict.

That analysis presumes that the rash that appeared in January 2013 was the initial manifestation of A.W.'s atopic dermatitis.  However, Dr. MacGinnitie presented an opinion that A.W.'s first manifestation of atopic disease was actually the bronchiolitis that developed following the RSV in December 2012.  Dr. MacGinnitie's opinion was plausible on its face and when Dr. Byers was asked to respond to this opinion during the hearing, Dr. Byers agreed that Dr. MacGinnitie's opinion was "possible."  She did not seriously question it.

Thus, the onset of A.W.'s atopic disease could be marked by any of three dates: the RSV-bronchiolitis at the end of December 2012, the rash that started about one week after the January 2, 2013 DTaP vaccination as mom suggested, or a rash that started about two weeks after the January 2, 2013 DTaP vaccination as Dr. Byers assumed.  Resolving when A.W. first showed a sign or symptom of her atopic disease ultimately is not needed because Ms. Wood's case fails for the many other reasons discussed above.

Additional Comments Regarding Dr. Byers

In her long career, Dr. Byers has participated in proceedings in the Vaccine Program many times.  Special masters have both credited Dr. Byers's opinion and strongly criticized her performance.  Compare Sajbel v. Sec'y of Health & Human Servs., No. 14-741V, 2017 WL 1491912 (Fed. Cl. Spec. Mstr. Mar. 31, 2017) (finding Dr. Byers's opinion persuasive) with Bigbee v. Sec'y of Dep't of Health & Human Servs., No. 06-663V, 2012 WL 1237759, at *30 (Fed. Cl. Spec. Mstr. Mar. 22, 2012) (criticizing Dr. Byers and citing cases).

This history of participating in cases in the Vaccine Program is consistent with Dr. Byers's estimate that she derives approximately 50 percent of her income from work in litigation.  In other words, she is a professional expert.  Normally, a doctor who participates in so many legal cases would learn the norms of litigation.  This is one advantage to retaining a doctor who is comfortable in the courtroom.

However, Dr. Byers's work in this case fell well short of what is expected from an expert.  A list of deficiencies include:

6

1. Not knowing the contents of the vaccine.  In her first report, Dr. Byers initially stated that the panel of vaccinations that A.W. received contained egg.  Exhibit 7 at 6.  Dr. Byers used this assertion as the foundation for a theory connecting the vaccination to A.W.'s egg allergy.  In his first report, Dr. MacGinnitie stated in bold "None of the vaccines that A.W. was exposed to at 2 months contain egg." Exhibit A at 4.  Dr. Byers responded to Dr. MacGinnitie's report, yet did not address this central point.  Despite this, Ms. Wood framed her theory of the case in her pre-trial brief around the premise that "Vaccines contain proteins such as chicken egg."  Page 8.  In the pre-trial conference, the undersigned had the following dialogue with the petitioner's attorney:

> Special Master: You say in your brief, page 8, that the vaccine panel administered to A.W. contained both egg and milk proteins. That is not readily apparent to me.  That may be true.  But, that doesn't seem clear to me.

> Mr. Brazil: That is something that Dr. Byers was adamant about and told me and will testify about.  She says that they do contain those ingredients.

> Special Master: Okay.

Ms. Wood was subsequently instructed to have Dr. Byers explain the basis of her knowledge about the manufacturing process of vaccines.  In response, Ms. Wood filed the CDC's list of vaccine excipients.  Exhibit 19.  However, the CDC list appeared to confirm Dr. MacGinnitie's statement and, accordingly, showed that Dr. Byers's initial assertions were false.  However, it was not until the morning of the first day of the hearing that the petitioner stipulated to the fact that the vaccine did not contain egg.  Thus, Dr. Byers constructed her theory upon a false premise—that the relevant vaccines contain egg—that Dr. Byers could have checked easily and apparently did not.  This lack of attention to a central part of her theory reflects poorly on Dr. Byers's work as an expert witness.

2. Introduction of new theories during the hearing.  Before the order for pre-trial briefs was issued, Dr. Byers had written two expert reports.  Exhibits 7 and 8.  In leading up to the hearing, the parties were ordered to confirm that their experts had disclosed all their opinions, the bases for their opinions, and any articles on which the expert was relying.  Order, issued July 12, 2017.  Dr. Byers then wrote another expert report, still indicating that A.W. reacted to eggs in vaccines. Exhibit 11 at 3.  But, as demonstrated above, Dr. Byers could not proceed on a theory built upon the assertion that vaccines contain eggs.  So, at hearing, Dr. Byers stated that the DTaP vaccine given to A.W. at two months contained beef residue.  Dr. Byers's shift from egg to beef as the inciting allergen was not anticipated.  Absent an objection from the Secretary, Dr. Byers was allowed to proceed.  As noted in the previous paragraph, this was completely the

consequence of Dr. Byers's inability, or unwillingness, to do her due diligence despite prodding from respondent and the undersigned that she might be incorrect.

3.  Not disclosing an opinion regarding eczema in her initial report.  Dr. Byers's first report presented the opinion that the vaccine caused A.W. to develop food allergies.  Exhibit 7 at 7.  This report was incomplete because Ms. Wood's claim was that the vaccines caused A.W. to develop food allergies *and* eczema.  After Ms. Wood was ordered to present an opinion from Dr. Byers that addressed both the food allergies and the eczema, Dr. Byers presented this opinion in her second report.  Exhibit 8.  However, the omission of a discussion of eczema in Dr. Byers's first report was noticeable.

4.  Not being able to respond to the epidemiologic studies Dr. MacGinnitie cited.  Dr. MacGinnitie challenged Dr. Byers's theory that vaccines cause food allergies and/or eczema by citing at least four epidemiologic studies in his first report.  See exhibit A.  About two months later, Dr. Byers responded with a two-page supplemental report, but did not comment on the epidemiologic studies.  At hearing, when Dr. Byers was asked to address the epidemiologic studies, she stated that she could not because she would need to read those studies.  Dr. Byers's lack of a meaningful response reflects inadequate preparation both when she wrote her second report and when she prepared to testify.

5.  Introducing an opinion about cytokines during the hearing.  As discussed above in connection with her theory, Dr. Byers needed to present a persuasive opinion that differentiated the effects of the trace amounts of beef to which A.W. was exposed through vaccination from the effects of the larger amounts of beef to which she was exposed through breast milk.  At hearing, Dr. Byers asserted that the vaccination stimulated the production of cytokines and the cytokines effectively kick-started the allergic process.  Yet, none of the three pre-trial reports from Dr. Byers discuss cytokines.  See exhibits 7, 8, and 11.  Due to the lack of disclosure, the Secretary could have objected to the introduction of this opinion.  See Simanksi v. Sec'y of Health & Human Servs., 671 F.3d 1368, 1382 (Fed. Cir. 2012) (stating "the special master can order the experts to confine their testimony to the issues addressed in their reports").

6.  Relying upon a questionable journal and inability to defend her reliance on the Institute of Medicine.  To support her argument that residues from the process of manufacturing vaccines can cause food allergies, Dr. Byers extensively quoted an article urging the Food and Drug Administration to require warning labels.  Exhibit 8 at 1-2.  That article stated that the Institute of Medicine had "confirmed that food proteins in vaccines cause food allergy, in its 2011 report on vaccine adverse effects."  Exhibit 15.  However, as Dr. MacGinnitie noted, this article was published in a disreputable journal that publishes articles without peer-review in order to collect the submission fees.  Exhibit C at 1-2.  Thus, the journal's reliability was suspect.  Nevertheless, in a subsequent report Dr. Byers defended the journal and stated that the references in the article "are all correct."  Exhibit 21

at 2.  Relying on Dr. Byers's use of this article, petitioner cited it twice in her pre-trial brief.  However, when Dr. Byers was asked to show where the IOM stated that food proteins in vaccines cause food allergies, Dr. Byers said she did not know.  Given the value special masters place on IOM reports and the pre-hearing dispute over the validity of this statement, Dr. Byers should have been prepared to support her assertions.  Dr. Byers's inability to do so reflects poorly on her preparation.  It was only at the hearing, after being presented with information about the journal's bona fides, did Dr. Byers acknowledge that relying on the journal was a mistake.  It concerns the undersigned that Dr. Byers is unable, or unwilling, to evaluate the source of her material before presenting it into the record.

While this list of concerns about Dr. Byers's performance is not as lengthy as set forth in the bench ruling, the items in this list provide a sample of deficiencies in Dr. Byers's performance as an expert witness.  These lapses are not a product of the Secretary retaining an expert better qualified than Dr. Byers, although Dr. MacGinnitie actually is much more qualified than she.  Rather, without respect to Dr. MacGinnitie, Dr. Byers was responsible for presenting a more thorough and more substantial work product—beginning with her written reports—than she ultimately did.

These criticisms of Dr. Byers have a dual purpose.  First, they are intended to inform Dr. Byers of ways she can improve.  Second, this decision is intended to alert other petitioners about the advantages and disadvantages of retaining Dr. Byers.  This notification is especially important in Vaccine Act cases since, unlike this decision, the transcript of Dr. Byers's testimony and her reports remain unavailable to the public.

These criticisms should not be interpreted as effectively banning Dr. Byers from the Vaccine Program.  As noted above, at times, special masters have found her opinions persuasive and thus the undersigned believes that Dr. Byers has the capacity to be an effective expert in a case that matches her qualifications.  However, Dr. Byers cannot rest on these past successes.  See La Londe v. Sec'y of Health & Human Servs., 110 Fed. Cl. 184, 208 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014)  (stating, with respect to a different expert, "[w]hile the existence of prior successful testimony may lend credence and enhance an expert's reputation, it cannot provide the justification for a special master to ignore expert opinion–oral or written–if that opinion is incoherent, illogical, inconsistent, or incorrect").  Nonetheless, given the stakes for an individual petitioner, potential claimants should know that while Dr. Byers can be a persuasive expert, she has also displayed practices that have undermined a petitioner's case.

Though Dr. Byers's preparation and testimony left much to be desired, she should not carry all the burden here.  It is petitioner's responsibility to do the due diligence of fact-checking reports prior to submitting them to the court and ensuring that experts have the entire record from which to work.  Ms. Wood brought her petition in 2015.  There is no excuse for waiting until the 2018 hearing to address the inconsistencies and deficiencies presented by one's expert.  Presenting strained and internally inconsistent theories in the guise of zealous advocacy is rarely helpful to the court or to the party themselves.

The undersigned is sympathetic to the fact that it is difficult, at times, for petitioners to find experts willing to testify in these cases and recognizes, as noted above, that Dr. Byers has assisted this court in understanding complex issues in the past.  As such, the undersigned appreciates Dr. Byers's willingness to bring her expertise to assist the triers of fact in these cases.  That notwithstanding, her lack of thorough preparation in this case serves the interests of neither the petitioner nor the court.

In summary, for the reasons noted above and further elucidated in the bench ruling, the undersigned finds that Ms. Wood has not met her burden of proof under the Vaccine Act.  The evidence does not support, by a preponderance of the evidence, that A.W.'s vaccinations caused her food allergies and/or eczema.

The undersigned further directs the Clerk's Office to enter judgment based upon the decision in this case if a motion for review is not filed.  When the time for filing a motion for review (see Vaccine Rule 23) begins to run is for an appellate tribunal to decide.

**IT IS SO ORDERED**.

S/Christian J. Moran
Christian J. Moran
Special Master