# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * * * * *
A.W., a minor, by and through her parent     *
and natural guardian, VANESSA WOOD,          *     No. 15-1568V
                                             *     Special Master Christian J. Moran
                  Petitioner,                *
                                             *     Filed: January 11, 2019
v.                                           *
                                             *
SECRETARY OF HEALTH                          *     Attorneys' Fees and Costs;
AND HUMAN SERVICES,                          *     attorney billing judgment; Dr. Vera Byers
                                             *
                  Respondent.                *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for petitioner;
Camille M. Collett, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION ON FEES AND COSTS[1]

On July 10, 2018, petitioner Vanessa Wood moved for final attorneys' fees and costs. **She is awarded $64,165.51.**

*      *      *

Ms. Wood alleged that her daughter, A.W., suffered from atopic dermatitis and food allergies as a result of a diphtheria-tetanus-acellular pertussis (DTaP) vaccine administered on January 2, 2013. Ms. Wood, acting as A.W.'s legal representative, brought this action seeking compensation for her daughter's injuries pursuant to the National Childhood Vaccine Injury Compensation Program, codified at 42 U.S.C. § 300aa−10 through 34 (2012).

Ms. Wood filed her petition on December 23, 2015. On April 22, 2016, the Secretary filed his Rule 4(c) report, arguing that compensation was not appropriate because the record failed to establish a causal link between the vaccination and the injuries alleged. Resp't's Rep. at

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

11.  During the course of the next year, both Ms. Wood and the Secretary filed reports from their respective expert witnesses.  A two-day hearing was held on January 24-25, 2018.  The undersigned found that Ms. Wood did not meet her burden of proof under the Vaccine Act and denied compensation.  Decision, issued Feb. 1, 2018, 2018 WL 1150730.  In the decision denying compensation, the undersigned noted that petitioner's expert, Dr. Vera Byers, undermined her own client's case by failing to exercise due care in executing her role as an expert witness.  Id. at 6-10.

Ms. Wood now seeks reimbursement of $97,427.59 in fees and costs she incurred in the course of bringing her claim for compensation.  Her motion includes a request for $18,800 in costs for Dr. Byers' expert reports and testimony.  In his response to petitioner's motion for fees and costs, the Secretary stated that he "is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case."  Resp't's Resp., filed July 24, 2018, at 2.  However, the Secretary did not present any specific objections to the content of the fees motion, instead deferring to the undersigned to determine a reasonable fee award.  Id. at 3.

Although compensation was denied, petitioners who bring their petitions in good faith and who have a reasonable basis for their petitions may be awarded attorneys' fees and costs.  42 U.S.C. § 300aa–15(e)(1).  Here, the undersigned finds that Ms. Wood acted in good faith and that the evidence submitted in this case is sufficient to conclude that she had a reasonable basis to bring the petition.  Thus, Ms. Wood is eligible for an award of attorneys' fees and costs.  The only question at bar is whether the requested amount is reasonable.

In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness.  See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

## I.   Attorneys' Fees

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  This is a two-step process.  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008).  First, the court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  Id. at 1348.  Here, because the lodestar produces a reasonable amount, the second step is unnecessary.

### A.  Reasonable Hourly Rate

Ms. Wood requests compensation for work performed by three attorneys: Paul Brazil, Amy Senerth, and Bridget McCullough.  For Mr. Brazil, petitioner requests an hourly rate of $255 for 2015; $275 for 2016; $300 for 2017; and, $317 for 2018.  For Ms. Senerth and Ms. McCullough, petitioner requests an hourly rate of $225 for 2017, and $233 for 2018.  In addition, the attorneys utilized the services of a paralegal at an hourly rate of $125.

The Muller Brazil firm, based in Dresher, PA, has been previously awarded forum rates in the Vaccine Program.  See, e.g., Tyree v. Sec'y of Health & Human Servs., No. 16–586V, 2017 WL 4707720 (Fed. Cl. Spec. Mstr. Mar. 23, 2017); Griffis v. Sec'y of Health & Human Servs., No. 15–483V, 2017 WL 694538 (Fed. Cl. Spec. Mstr. Jan. 25, 2017); Colagreco v. Sec'y of Health & Human Servs., No. 14–465V, 2016 WL 6518579 (Fed. Cl. Spec. Mstr. Sept. 26, 2016). The undersigned sees no reason not to award forum rates here.

The hourly rates requested for Mr. Brazil for 2015-17 are consistent with rates the undersigned has previously awarded him.  See Arnold v. Sec'y of Health & Human Servs., No. 15-534V, 2017 WL 3165486, at *2 (Fed. Cl. Spec. Mstr. June 22, 2017). Mr. Brazil's 2018 rate is consistent with rates found to be reasonable by the Chief Special Master.  See Marino v. Sec'y of Health & Human Servs., No. 16-0622V, 2018 WL 4611637, at *1 (Fed. Cl. Spec. Mstr. June 22, 2018).  Likewise, Ms. Senerth's rates are consistent with rates previously awarded to her by the Chief Special Master.  See Roetgerman v. Sec'y of Health & Human Servs., No. 17-0244V, 2018 WL 4907033, at *1 (Fed. Cl. Spec. Mstr. July 3, 2018).  Ms. McCullough's experience appears similar to Ms. Senerth's and accordingly the undersigned finds Ms. McCullough's rates reasonable as well.  The paralegal's rate is also reasonable.

## B.  Reasonable Number of Hours

The Secretary did not directly challenge any of the requested hours as unreasonable. Reasonable hours are not excessive, redundant, or otherwise unnecessary.  See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).

As a general matter, the number of hours billed by the attorneys and paralegals in this case struck the undersigned as high relative to cases of similar complexity.  Based upon a review of the timesheets, this general impression may be the result of Mr. Brazil and his firm consistently inflating billing entries and requesting reimbursement for non-compensable work.

As an example, it appears that Mr. Brazil and his paralegal routinely considered 0.2 hours to be the minimum quantity of time for communications.  See, e.g., Pet'r's Fees Mot. at 5 (billing for 0.2 attorney hours for each of seven back-to-back emails on the same day regarding photos submitted by petitioner).  Considering the nature and frequency of the correspondence, 10-15 minutes as a minimum for the sending and receipt of emails appears high.  See Rasmussen v. Sec'y of Health & Human Servs., No. 91-1566V, 1996 WL 752289, at *2 (Fed. Cl. Spec. Mstr. Dec. 20, 1996) (noting that counsel's practice of billing in increments not smaller than a quarter hour could result in overbilling).

Even more troubling, the billing records show that Mr. Brazil routinely billed 0.1-0.2 hours for review of minute entries.[2]  As any practitioner in this program knows, the content is

---

[2] Mr. Brazil and his associates also billed for review of other standard notices and receipts from the court, such as receipts confirming that a filing had been received or scheduling orders that summarized the dates to which the parties had agreed during a preceding status conference.  This type of administrative work is generally not compensable.  See, e.g., Abbott v. Sec'y of Health & Human Servs., No. 10-485V, 2017 WL 2226614, at *8 (Fed. Cl. Spec. Mstr.

boilerplate with the only variables being the date, the length of the proceeding, the location of the proceeding, and whether a link is provided for the attorney to obtain a transcription of the proceeding in the case the proceeding was recorded. An example is illustrative: "Minute Entry for proceeding held in Chambers (telephonic) on 12/19/2017 before Special Master Christian J. Moran: Status Conference held on 12/19/2017. [Total number of days of proceeding: 1]. Proceeding was not officially recorded." The number of words in this minute entry is 33. An average attorney should read the entry in far less than one minute's time. Thus, billing 6-12 minutes for evaluating the entry seems excessive.

The undersigned ordered Mr. Brazil to show cause for the billing entries pertaining to the review of the minute entries. In his response to the show cause order, Mr. Brazil stated that it took him about thirty seconds to read each entry, and that he took "no issue with removing entries for review of minute entries." Pet'r's Resp., filed Oct. 8, 2018.

Based on Mr. Brazil's response, it appears that he does not understand the problem. According to the Supreme Court, when counsel submits an application for attorneys' fees, the attorney should exercise "billing judgment." See Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) (citing Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc) (emphasis in the original) ("In the private sector, billing judgment is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority")). But, charging 0.1 hours, let alone 0.2 hours, for a de minimis task that took, by Mr. Brazil's recollection, approximately 30 seconds is incompatible with billing judgment. It seems difficult to accept that an attorney would charge a fee-paying client (and the fee-paying client would accept a charge) for the time the attorney spent on such a small task. See Van Vessem v. Sec'y of Health & Human Servs., No. 11-132V, 2018 WL 3989517, at *6 (Fed. Cl. Spec. Mstr. July 3, 2018) ("[t]he undersigned finds that reviewing minute entries, notices of receipt, and informal communication notices are simple tasks. Therefore, the undersigned finds that billing even .10 hours for each such entry is excessive"); Weaver v. Lighthouse Recovery Assocs., LLC, No. 13-CV-01078-CMA-MJW, 2013 WL 6096137, at *2 (D. Colo. Nov. 19, 2013) (upon review of an attorney's invoice containing charges for reviewing minute entries, stating "Plaintiff's counsel is instructed to cease charging for administrative tasks at the attorney's hourly rate and to cease overcompensating himself for tasks that clearly require less time to complete"); see also Hensley, 461 U.S. at 434

The evident lack of billing judgment, in turn, raises larger questions about the fee invoice. Does Mr. Brazil's decision to bill 6-12 minutes for the review of these minute entries reflect a systemic problem with his billing? If Mr. Brazil saw no problem billing six minutes for 30 seconds of work, did he also bill 12 minutes for six-and-a-half minutes of work? Based on the general impression that the total number of hours billed appears high and clear evidence that Mr. Brazil inflated his billing entries, it seems reasonable to conclude that it may be Mr. Brazil's

---

Apr. 26, 2017), mot. for rev. denied, 135 Fed. Cl. 107 (2017). However, the focus in the text above is the minute entries since they provide an especially egregious example of the problem with the submitted bill.

practice to "round-up."  Given that there were nearly 500 billing entries in this case, the effect of that "rounding-up" becomes substantial.[3]

Excessive billing is not consistent with superior quality legal work.  Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 566-67 (1986).  While Mr. Brazil and his firm have earned a reputation of doing good work and obtaining good outcomes for their clients, the billing practices in this case may undermine that reputation.  Therefore, Mr. Brazil is expected to exercise more appropriate judgment about his invoices going forward.

In addition to inflated billing entries, petitioner has requested reimbursement of non-reimbursable costs related to travel.  First, Mr. Brazil's paralegal billed for time related to booking travel for the attorneys.  See Pet'r's Fees Mot. at 12.  Time spent booking travel, though it may be performed by a paralegal (or even an attorney), should not be billed at paralegal rates since it constitutes the type of work performed by an administrative assistant or secretary.  See Bratcher v. United States, 136 Fed. Cl. 786, 797, reconsideration denied, 137 Fed. Cl. 645 (2018) (declining to reimburse for work even at paralegal rates when plaintiffs failed to demonstrate that the work was not "largely clerical or secretarial in nature").  In addition, Mr. Brazil and his associates billed their full hourly rate for their time spent travelling.  See Pet'r's Fees Mot. at 15.  In the Vaccine Program, travel time is typically reimbursed at 50% of the established billing rate.  Gruber v. Sec'y of Health & Human Servs., 91 Fed. Cl. 773, 788 (2010) (citing Rodriguez v. Sec'y of Health & Human Servs., No. 06–559V, 2009 WL 2568468, at *21 (Fed. Cl. Spec. Mstr. Jul. 27, 2009); Kuttner v. Sec'y of Health & Human Servs., No. 06–195V, 2009 WL 256447, at *10 (Fed. Cl. Spec. Mstr. Jan. 16, 2009); Carter v. Sec'y of Health & Human Servs., No. 04–1500V, 2007 WL 2241877, at *6 (Fed. Cl. Spec. Mstr. Jul. 13, 2007); English v. Sec'y of Health & Human Servs., No. 01–61V, 2006 WL 3419805, at *12–13 (Fed. Cl. Nov. 9, 2006)).

For the aforementioned reasons, the undersigned finds a 20% reduction in the total number of hours billed to be appropriate.  This reduction, in the undersigned's estimation of the billing records as they compare to the complexities of this case, will account for the excessive and ineligible hours billed by Mr. Brazil's firm.  Mr. Brazil is warned that if future fee requests contain this same unreasonable billing, then his invoice may be reduced further.  See Valdes v. Sec'y of Health & Human Servs., No. 99–310V, 2009 WL 1456437, at *4 (Fed. Cl. Spec. Mstr. Apr. 30, 2009) (warning attorney that penalties may be necessary to motivate him to submit requests for fees that do not contain "erroneous, duplicative, or unreasonable entries"), mot. for rev. granted in non-relevant part and denied in non-relevant part, 89 Fed. Cl. 415 (2009).  Ms. Wood is accordingly awarded $57,537.12 in attorneys' fees.

## II.   Costs

In addition to seeking attorneys' fees, Ms. Wood requests reimbursement of $25,506.19 in costs.  Pursuant to General Order No. 9, she has confirmed she did not individually incur any costs and that all costs were borne by her attorney.  Ms. Wood's request includes costs associated

[3] Assuming that Mr. Brazil always rounded up and that the amount of time actually spent was evenly distributed (in reality, the distribution centers towards the lower number of hours billed), over the course of 500 entries there would be approximately $6,100 in excess billing.

with travel, hotel, taxis, copying, and acquiring medical records. These costs are reasonable and are awarded in full.

However, the vast majority of Ms. Wood's request ($18,800.00) is for Dr. Vera Byers' expert reports and expert testimony in this case. The undersigned finds this expense unreasonable based upon Dr. Byers' performance in this case. Accordingly, it is not compensable.

Dr. Byers has impressive qualifications. Dr. Byers was awarded an M.D. from UCSF and a Ph.D. from UCLA. Exhibit 10 at 1. The undersigned has previously noted the value that physician-scientists like Dr. Byers may bring to the Vaccine Program. See Dominguez v. Sec'y of Health & Human Servs., No. 12-378V, 2018 WL 3028975, at *4 (Fed. Cl. Spec. Mstr. May 25, 2018). Dr. Byers is board certified in internal medicine and has taught occasionally at UCSF over a period of 30 years, until 2008. Exhibit 10 at 1, 4. During this time, Dr. Byers has done research on the development of vaccines against poison oak and dust mite allergies. As the result of her work, she has been elected to the American Academy of Allergy and Immunology. Id. at 2. She is also well-published. Id. at 1.[4]

Though Dr. Byers has bona fides as a physician and a scientist, her reputation as an expert witness is not impressive. As the Secretary argued in his pre-trial brief, special masters in the Vaccine Program have repeatedly found that she routinely speaks outside of her area of expertise and has been loose with the facts that are predicates to her opinion. Even when Dr. Byers is testifying within her specialty, she has relied upon questionable logic and ignored well-established science when that science contradicts her opinion. See Resp't's Br., filed December 22, 2017, at 14-16 (citing half a dozen cases where special masters or Court of Federal Claims judges criticized Dr. Byers for presenting testimony "missing a strong connection to the facts" and that "strayed into matters beyond her expertise." She was also characterized as "not a particularly good expert witness" who was "disjointed and often unclear"). To be sure, in some instances Dr. Byers has provided helpful testimony that advanced a petitioner's claims. See Pet'r's Br. at 5-6 (citing a special master who characterized Dr. Byers' testimony as credible and plausible, and another characterizing it as pertinent and helpful). However, those instances occur less frequently, and are outnumbered by instances in which she has been criticized.

Unfortunately for Ms. Wood, Dr. Byers' work in this case was of poor quality. The undersigned elucidated many of the issues with Dr. Byers' work product in the bench ruling. Some of those issues were also memorialized in the written decision denying Ms. Wood compensation. These included:

---

[4] At the beginning of Dr. Byers' curriculum vitae (C.V.), she states that she has "published over 300 articles, reviews and abstracts in peer reviewed medical journals." Exhibit 10 (C.V.) at 1. However, the C.V. actually lists 138 articles with the most recent publication occurring in 2013. Id. at 14. Although Ms. Wood had been ordered to file an updated C.V. for Dr. Byers, Ms. Wood submitted an old C.V. and Dr. Byers testified that since 2013, she has published three more articles. Tr. 140-41.

1. Not knowing the contents of the vaccine.  In her first report, Dr. Byers initially stated that the panel of vaccinations that A.W. received contained egg.  Exhibit 7 at 6.  Dr. Byers used this assertion as the foundation for a theory connecting the vaccination to A.W.'s egg allergy.  In his first report, the Secretary's expert, Dr. MacGinnitie, stated in bold "None of the vaccines that A.W. was exposed to at 2 months contain egg."  Exhibit A at 4.  Dr. Byers responded to Dr. MacGinnitie's report, yet did not address this central point.  See exhibit 8.  Despite this, Ms. Wood framed her theory of the case in her pre-trial brief around the premise that "vaccines contain proteins such as chicken egg."  Pet'r's Br., filed Nov. 15, 2017, at 8.  In the pre-trial conference, the undersigned had the following dialogue with petitioner's attorney:

   > Special Master: You say in your brief, page 8, that the vaccine panel administered to A.W. contained both egg and milk proteins.  That is not readily apparent to me.  That may be true.  But, that doesn't seem clear to me.

   > Mr. Brazil: That is something that Dr. Byers was adamant about and told me and will testify about.  She says that they do contain those ingredients.

   > Special Master: Okay.

   Ms. Wood was subsequently instructed to have Dr. Byers explain the basis of her knowledge about the manufacturing process of vaccines.  In response, Ms. Wood filed the CDC's list of vaccine excipients.  Exhibit 19.  However, the CDC list appeared to confirm Dr. MacGinnitie's statement and, accordingly, showed that Dr. Byers' initial assertion was false.  However, it was not until the morning of the first day of the hearing that petitioner stipulated to the fact that the vaccine did not contain egg.  Thus, Dr. Byers constructed her theory upon a false premise—that the relevant vaccines contain egg—that Dr. Byers could have checked easily and apparently did not.  This lack of attention to a central part of her theory reflects poorly on Dr. Byers' work as an expert witness.

2. Introduction of new theories during the hearing.  Before the order for pre-trial briefs was issued, Dr. Byers had written two expert reports.  Exhibits 7, 8.  In leading up to the hearing, the parties were ordered to confirm that their experts had disclosed all their opinions, the bases for their opinions, and any articles on which the expert was relying.  See order, issued July 12, 2017.  Dr. Byers then wrote another expert report, still indicating that A.W. reacted to eggs in vaccines.  Exhibit 11 at 3.  But, as demonstrated above, Dr. Byers could not proceed on a theory built upon the assertion that the vaccine contained egg.  So, at the hearing, Dr. Byers stated that the DTaP vaccine given to A.W. at two months contained beef residue.  Dr. Byers' shift from egg to beef as the inciting allergen was not anticipated.  This last-minute shift in theories further undermined Dr. Byers' credibility.  As noted in the previous paragraph, this shift was completely the consequence of Dr. Byers' inability, or unwillingness, to do her due diligence despite prodding from respondent and the undersigned that she might be incorrect in her factual assumptions.

3. Not disclosing an opinion regarding eczema in her initial report.  Dr. Byers' first report presented the opinion that the vaccine caused A.W. to develop food allergies.  Exhibit 7 at 7.  This report was incomplete because Ms. Wood's claim was that the vaccines caused A.W. to develop food allergies *and* eczema.  Ms. Wood was ordered to present an opinion from Dr. Byers that addressed both the food allergies and the eczema and Dr. Byers presented this opinion in her second report.  See exhibit 8.  However, the absence of any discussion about eczema in Dr. Byers' first report was a material omission.

4. Not being able to respond to the epidemiologic studies Dr. MacGinnitie cited.  Dr. MacGinnitie challenged Dr. Byers' theory that vaccines cause food allergies and / or eczema by citing at least four epidemiologic studies in his first report.  See exhibit A.  About two months later, Dr. Byers responded with a two-page supplemental report, but did not comment on the epidemiologic studies.  At the hearing, when Dr. Byers was asked to address the epidemiologic studies, she stated that she could not because she would need to read those studies.  Dr. Byers' lack of a meaningful response reflects inadequate preparation both when she wrote her second report and when she prepared to testify.  This lack of preparation significantly undermined Ms. Wood's ability to obtain compensation.

5. Introducing an opinion about cytokines during the hearing.  As discussed above in connection with her theory, Dr. Byers needed to present a persuasive opinion that differentiated the effects of the trace amounts of beef to which A.W. was exposed through vaccination from the effects of the larger amounts of beef to which she was exposed through breast milk.  At hearing, Dr. Byers asserted that the vaccination stimulated the production of cytokines and the cytokines effectively "kick-started" the allergic process.  Yet, none of the three pre-trial reports from Dr. Byers discussed cytokines.  See exhibits 7, 8, and 11.  Due to the lack of disclosure, the Secretary could have objected to the introduction of this opinion.  See Simanski v. Sec'y of Health & Human Servs., 671 F.3d 1368, 1382 (Fed. Cir. 2012) (stating "the special master can order the experts to confine their testimony to the issues addressed in their reports").

6. Relying upon a questionable journal and an inability to defend her contradicted representation of a report from the Institute of Medicine.  To support her argument that residues from the process of manufacturing vaccines can cause food allergies, Dr. Byers extensively quoted an article urging the Food and Drug Administration to require warning labels.  Exhibit 8 at 1-2.  That article stated that the Institute of Medicine had "confirmed that food proteins in vaccines cause food allergy, in its 2011 report on vaccine adverse effects."  Exhibit 15 at 1.  However, as Dr. MacGinnitie noted, this article was published in a disreputable journal that publishes articles without peer-review in order to collect the submission fees.  Exhibit C at 1-2.  Articles published in these "pay-to-play" journals do not deserve the deference given to peer-reviewed scientific literature and adjudicators must be careful before relying on the contents of these articles.  See McCabe v. Sec'y of Health & Human Servs., No. 13-570V, 2018 WL 3029175, at *54 (Fed. Cl. Spec. Mstr. May 17, 2018).  Nevertheless, in a subsequent report, Dr. Byers defended the journal and stated that the references in the article "are all correct."  Exhibit 21 at 2.  Relying on Dr. Byers' use of this article, petitioner cited it twice in her pre-trial

brief.  See Pet'r's Br., filed Nov. 15, 2017, at 9, 14.  However, when Dr. Byers was asked to show where the IOM stated that food proteins in vaccines cause food allergies, Dr. Byers said she did not know.  Given the value special masters place on IOM reports and the pre-hearing dispute over the validity of this statement, Dr. Byers should have been prepared to support her assertions.  Dr. Byers' inability to do so reflects poorly on her preparation.  It was only at the hearing, after being presented with information about the journal's bona fides, that Dr. Byers acknowledged that relying on the journal was a mistake.  Dr. Byers' failure to evaluate the source of her material before presenting it into the record was concerning.

See Decision, issued Feb. 1, 2018, at 6-9 (changes made without notation).

Each of these deficiencies are significant.  But, among all the problems, the worst is the assertion that the DTaP vaccine contains egg.  Dr. Byers' assertion became the foundation for Ms. Wood's theory.  It was critical to the outcome.  However, it was wrong.

In the decision denying compensation, the undersigned noted that, for each of these issues, the deficiency was not the result of the fact that the Secretary provided a more qualified or credible expert.  Id. at 9.  Instead, the deficiencies reflected Dr. Byers' failure to do the work properly.  As noted in the decision, Dr. Byers' failure to confirm that her opinions were based on correct facts undermined petitioner's case.  Id.  This raises the question of whether Dr. Byers should be compensated for the work at all.

When there are questions about experts' work quality, special masters will sometimes find it reasonable to reduce an experts' hourly rate or adjust the number of hours billed to reflect the quality of the work produced.  See, e.g., Dominguez, 2018 WL 3028975, at *10 (citing Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 (2009) (noting that the "nature, quality, and complexity of the information provided" can inform evaluations of expert fees)).  These types of adjustments can reflect the fact that paying the experts without the reduction would compensate them disproportionately to the quality of the services provided.

However, due to the many significant deficiencies, identified above, a simple reduction does not appear to be the correct approach here.  To compensate Dr. Byers, even in part, for the work product she supplied in this case would require the undersigned to conclude that it is reasonable to pay Dr. Byers *any* amount of money for the work she produced.  See McIntosh, 139 Fed. Cl. at 248 ("The Vaccine Act plainly requires a Special Master to determine that the fees and costs requested by a petitioner's attorney were reasonable before making an award").  In evaluating whether an expense reaches the "reasonable" standard, the Federal Circuit has endorsed a special master's evaluation of whether a hypothetical client would pay for the expenses being submitted for compensation to the Vaccine Program.  See Riggins v. Sec'y of Health & Human Servs., 406 F. App'x 479, 484 (Fed. Cir. 2011).  In the undersigned's estimation, a hypothetical client who received the services provided by Dr. Byers to Ms. Wood in this proceeding would conclude that Dr. Byers failed to do the work she was retained to perform.  As a result, a hypothetical client would reasonably dispute her (or his) obligation to pay Dr. Byers any portion of the negotiated fee.

The undersigned recognizes that deciding that it would be unreasonable to provide any compensation for Dr. Byers' work is unusual.  However, it is not without precedent.  See Masias v. Sec'y of Health & Human Servs., No. 99-697V, 2009 WL 1838979, at *39 (Fed. Cl. Spec. Mstr. June 12, 2009), mot. for review denied, No. 99–697V, slip op. at 11 (Fed. Cl. Dec. 10, 2009), aff'd, 634 F.3d 1283 (Fed. Cir. 2011); Sabella v. Sec'y of Health & Human Servs., No. 02-1627V, 2008 WL 4426040, at *36 (Fed. Cl. Spec. Mstr. Sept. 23, 2008), mot. for rev. denied in relevant part, 86 Fed. Cl. at 221.[5]  Dr. Byers is not new to the Vaccine Program, and she has had the opportunity to learn what is expected of her.  As noted in the decision denying compensation, Dr. Byers earns half of her income through work as an expert.  Decision, issued Feb. 1, 2018, at 6.  And yet, despite numerous warnings on the part of special masters in the Vaccine Program, Dr. Byers has continued to provide testimony that is substandard.  Continuing to note that Dr. Byers submits substandard work-product and paying her for that work-product appears to be internally inconsistent.

Whether the unreimbursed cost for Dr. Byers ultimately falls upon Dr. Byers or Mr. Brazil is not material.[6]  Mr. Brazil shares some responsibility.  As noted in the decision denying compensation, Mr. Brazil should have done more to ensure that the opinion being provided by his expert was facially logical and consistent with the facts.  Decision, issued Feb. 1, 2018, at 6.  Mr. Brazil's failure to do so here is even more notable given the decisions criticizing Dr. Byers' opinions.  Dr. Byers' performance as an expert is something Mr. Brazil was, or should have been, aware of before Dr. Byers was ever retained in this case.  If the present decision causes future attorneys to monitor Dr. Byers' work product more closely, then that oversight would also be a benefit to all participants in this Program.

The extreme deficiencies with Dr. Byers' work in this case should make this decision exceptional.[7]  The undersigned expects that qualified experts who present supported, if ultimately unpersuasive, opinions will continue to receive reasonable compensation commensurate with their experience and training.  While the undersigned appreciates that a decision to not compensate an expert for his or her participation could potentially chill the participation of other experts, it must be emphasized that the bar set here for Dr. Byers' is low.  Dr. Byers has been warned repeatedly that her work product falls far short of what is expected.  Dr. Byers was even warned early in this very proceeding that some of her reports just did not make sense based on the facts in the record.  These warnings were ignored.

---

[5] The undersigned also recognizes that this decision could make petitioners less interested in retaining Dr. Byers.  Any hesitation is not necessarily a bad thing.

[6] Mr. Brazil may not charge Ms. Wood any fee for Dr. Byers' work.  See 42 U.S.C. § 300aa-15(e)(3); Beck v. Sec'y of Health & Human Servs., 942 F.2d 1029 (Fed. Cir. 1991); Pestka v. Sec'y of Health & Human Servs., No. 06-708V, 2015 WL 11109789 (Fed. Cl. Spec. Mstr. Mar. 25, 2015).

[7] If Dr. Byers presents reasonable and well-grounded opinions, the undersigned will not hesitate to compensate Dr. Byers for her work in future cases.

Compensating Dr. Byers for her work in this case creates a greater systemic hazard for this Program than not doing so.  A system in which experts would be paid substantial amounts of money, regardless of the quality of their opinion, may harm future petitioners whose cases would be delayed as special masters resolved other weak cases buttressed by baseless expert opinions, and / or who may themselves, unwittingly, turn to an expert like Dr. Byers despite her past performance in this Program.  In the undersigned's experience in the Vaccine Program, both hazards are not hypothetical concerns, but real issues that are frustrating Congress's objectives for the Program.

Accordingly, for the aforementioned reasons, the undersigned finds the expenses associated with Dr. Byers' testimony to be unreasonable and thus not compensable under the Vaccine Act.

## III.    Conclusion

Accordingly, petitioner is awarded:

**A lump sum of $64,165.51 in the form of a check made payable to petitioner and petitioner's attorney, Paul R. Brazil.**

This amount represents reimbursement for attorneys' fees and other litigation costs available under 42 U.S.C. § 300aa-15(e).  In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court shall enter judgment in accordance herewith.[8]

**IT IS SO ORDERED**.

S/Christian J. Moran
Christian J. Moran
Special Master

---

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.